## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**MARIO MARCUS,**

          **Plaintiff,**

                        :

    **v.**                                **Case No. 2:19-cv-4238**
                                                           **Judge Sarah D. Morrison**
                                                           **Magistrate Judge Kimberly A.**

**FRANKLIN COUNTY**                **Jolson**
**SHERIFF DALLAS**
**BALDWIN,**                        :

          **Defendant.**

## OPINION AND ORDER

The backstory of this lawsuit is a confrontation at a grocery store between a store employee and Plaintiff Deputy Sheriff Mario Marcus (an African American) while he was off-duty and out-of-uniform. The Franklin County Sheriff's Office ("FCSO") terminated Dep. Marcus after the confrontation. Dep. Marcus filed this lawsuit alleging race discrimination against Defendant Franklin County Sheriff Dallas Baldwin.

Defendant filed a Motion for Summary Judgment. (Mot., ECF No. 39.) Dep. Marcus opposes the Motion (Opp., ECF No. 42), and Defendant has replied (Reply, ECF No. 45). Dep. Marcus's Motion for Surreply is also before the Court (ECF No. 47), which Defendant opposes (ECF No. 50). These Motions are ripe for consideration.

For the reasons set forth below, the Motion for Surreply is **DENIED**, and the

Motion for Summary Judgment is **DENIED**.

## I.  FACTUAL BACKGROUND

The FCSO hired Dep. Marcus in January 2010. (Marcus Dep., ECF No. 39-21, 22:24–23:1.) He was assigned to the patrol division around September 2015 and remained part of that division during the events leading up to and at the time of his termination. (*Id.* 23:12–15.)

### A.  Kroger Incident

On April 1, 2017, Dep. Marcus was shopping at Kroger, which was having a sale on Powerade beverages. (*Id.* 47:3–13; Taped Interview of Deputy Mario Marcus ("Taped Interview"), ECF No. 39-9, PageID 167.) He attempted to purchase 40 Powerade bottles but a clerk informed him that he could only purchase 20 Powerade bottles at the sale price. (*Id.*; Marcus Dep. 47:14–21; Taped Interview, PageID 167.) Dep. Marcus asked about the terms of the limit—whether it was 20 bottles per transaction, visit, or family. (Marcus Dep. 47:22–48:20; Taped Interview, PageID 167.) The clerk did not know so she called a supervisor. (*Id.*) When the supervisor did not respond, Dep. Marcus told the employee he would pay for 20 bottles, go around the register, get in line again, and pay for the remaining 20 bottles rather than hold up the line. (*Id.*) The clerk said that was fine. (*Id.*) Dep. Marcus left the checkout lane with 20 purchased Powerade bottles, other groceries, and 20 unpurchased Powerade bottles. (Christian Dep. Ex. 7, Video 2, 15:30:51-15:32:22.)

The parties dispute what happened next, but there is video footage (without

audio) of the incident.[1] (*Compare* Mot. PageID 94 *with* Opp. PageID 799–801 *with*
Reply PageID 1776–77; *see* Christian Dep. Ex. 7, Video 2, 15:30:51–15:32:22.) When
Dep Marcus was a few feet from the checkout lane, Kroger employee Kenneth Truss
stopped him. (Christian Dep. Ex. 7, Video 2, 15:30:51-15:32:22.) Mr. Truss stepped
in front of Dep. Marcus's cart and, when Dep. Marcus tried to go around him, Mr.
Truss grabbed the cart with his hand. (*Id.*) Mr. Truss then put his foot in front of
the cart and moved his body back in front of the cart. (*Id.*) The video shows the two
men talking. (*Id.*) Dep. Marcus then moved around the cart and attempted to pull it
from the front, pushing Mr. Truss to the side. (*Id.*)

At that point, a second Kroger employee approached the cart. (*Id.*) Mr. Truss
attempted to move around Dep. Marcus, and while he did so, wrapped his arms
around Dep. Marcus's torso causing  Dep. Marcus to give Mr. Truss an open-handed
shove to the face. (*Id.*) The second Kroger employee was forced to separate Dep.
Marcus and Mr. Truss. (*Id.*) A third Kroger employee then approached the cart and
Dep. Marcus waited while the Kroger employees unloaded the unpurchased
Powerade bottles. (*Id.*) Dep. Marcus left the store and went home. (*Id.*; Marcus Dep.
50:23–51:2.)

A Kroger employee called the Columbus Police about the incident. (Marcus
Dep. 51:7–14; Christian Aff., ECF No. 39-25, ¶ 5f.) Dep. Marcus returned to Kroger

---

[1] The Court construes disputed facts in a light most favorable to Dep. Marcus,
*see Davenport v. Causey*, 521 F.3d 544, 546 (6th Cir. 2008), but relies heavily on
the video footage depicting the confrontation, *see Scott v. Harris*, 550 U.S. 372, 380
(2007) (establishing the high value of video footage in resolving factual disputes
between the parties).

before the police arrived because "[he knew] the police [would] be there in a minute." (Marcus Dep. 51:7–14.) The police took statements for a report, first from Dep. Marcus and then Mr. Truss. (Marcus Dep. 51:19–54:3.) At that time, Mr. Truss "said he wasn't filing charges"; nevertheless, the police referred him to the Columbus City Attorney's office if he wanted to press charges. (*Id.* 54:20–21; Christian Aff. ¶ 5h; Internal Affairs Investigation # 17-194 from Chief Deputy David A. Conley to Lieutenant Timothy Christian ("Investigation Memo"), ECF No. 39-8, PageID 147.) There were no injuries, and Dep. Marcus was not charged with any crime at the scene. (Marcus Dep. 52:10–17.)

During a subsequent interview, Mr. Truss said that he stopped Dep. Marcus because the bagger was placing bags on top of the unpurchased Powerade bottles, and Mr. Truss thought Dep. Marcus was trying to conceal merchandise. (Investigation Memo, PageID 146–47.) But another Kroger employee present during the incident stated that "Dep. Marcus was trying to get away from Mr. Truss so he could purchase the remaining 20 Powerades in his cart," which is consistent with Dep. Marcus's testimony. (*Id.* PageID 150; Marcus Dep. 48:14–20.)

## B. Assault Charge

A few days later, Mr. Truss met with the Columbus City Attorney's office, which led to the filing of an assault charge against Dep. Marcus in Franklin County Municipal Court on April 7, 2017 ("Assault Charge"). (Christian Aff. ¶ 6; ECF No. 39-2.) The parties dispute when Dep. Marcus learned of that Assault Charge. According to Dep. Marcus, he told an attorney friend (Christopher Cooper) that charges might be filed against him and asked Attorney Cooper to "look in to it."

4

(Taped Interview, PageID 189.) On April 21, Attorney Cooper did so and filed a jury demand in response to the Assault Charge. (ECF No. 39-3; Taped Interview, PageID 189.) Attorney Cooper's signature is on the demand; Dep. Marcus's is not. (ECF No. 39-3.) Dep. Marcus claims that Attorney Cooper did not tell him about the Assault Charge and jury demand filing until later. (ECF No. 39-11, PageID 215.)

Dep. Marcus received a notice of the Assault Charge in the mail sometime between April 27 and 29; his wife, who was home while he was in West Virginia, told him about the notice. (Taped Interview, PageID 188–189.) He told his supervisors about the Assault Charge on May 2—his first shift back at work after returning from West Virginia. (Christian Aff. ¶ 12; ECF No. 39-4.) He claims that this notice of the Assault Charges was consistent with FCSO Rule of Conduct 28.1 requiring deputies to report arrests or court action:

> Personnel shall report, in writing, arrests or court actions instituted against them, except divorce proceedings and child support proceedings, to their immediate supervisor and to the Sheriff within 24 hours of the arrest or the receipt of court documents instituting court action against them, unless unable to do so due to extenuating circumstances. Thereafter, it shall be the responsibility of the employee to provide status reports, in writing, through the chain of command to the Sheriff as court proceedings occur, unless unable to do so due to extenuating circumstances.

(ECF No. 39-10.)

The Assault Charge against Dep. Marcus was ultimately dismissed when he paid $150 in court costs and completed 40 hours of community service. (Christian Aff. ¶ 7; ECF Nos. 39-5, 39-6.)

## C. IA Investigation

FCSO opened an internal affairs ("IA") investigation into the incident and Dep. Marcus's report of the Assault Charge; investigator Lieutenant Timothy Christian was assigned to the matter. (Christian Aff. ¶¶ 3, 4.) During the investigation, Dep. Marcus was reassigned to Corrections and was not allowed to work special duty assignments, as is routine when an IA investigation is underway. (Gilbert Aff., ECF No. 39-22, ¶¶ 5–8; Flynn Aff., ECF No. 39-24, ¶¶ 5–6.) Dep. Marcus and seven Kroger employees, including Mr. Truss, were interviewed by Lt. Christian. (Christian Aff. ¶ 4.)

Dep. Marcus was questioned on February 8, 2018, at which time he denied learning about the Assault Charge on April 21, 2017 and said that he did not tell Attorney Cooper to file the jury demand on his behalf. (Taped Interview, PageID 188–89, 201.) Near the end of the interview, Dep. Marcus and Lt. Christian had the following back and forth:

Christian: Are you aware of it or you're not aware of it?

M. Marcus: dis . . . dis . . . disregard . . . disregard

Christian: So were you aware of this assault then?

M. Marcus: Am I . . .

Christian: Were you aware of it on the 21st?

M. Marcus: Yea I was aware of . . .

(Taped Interview, PageID 201; Christian Aff. ¶ 15.) Based on this exchange, Lt. Christian concluded that Dep. Marcus knew about the Assault Charge on April 21

and that Dep. Marcus had lied earlier in the interview when he denied knowing of the Assault Charge on that date. (*Id.*)

At the conclusion of his investigation, Lt. Christian recommended to Chief Deputy David A. Conley that Dep. Marcus be disciplined for committing 19 violations of the Rules of Conduct, including: AR102:29 Unbecoming Conduct, AR 102:28:1 Court Actions, and AR 102:1.7 Lying to Internal Affairs (the "Lying Rule"). (Christian Aff. ¶ 17; ECF No. 39-8, PageID 165.) The Lying Rule was the most serious violation because a violation of that rule automatically results in termination: "In order to protect the integrity of the Office and for Internal Affairs to effectively conduct investigations, lying to Internal Affairs investigators *shall result in an employee's removal from service*." (ECF No. 39-10) (emphasis added).

### D. Pre-Disciplinary Hearing and Termination

Dep. Marcus's chain of command reviewed the IA investigation summary and recommended a pre-disciplinary hearing.[2] (Gilbert Aff. ¶¶ 12–13; Flynn Aff. ¶¶ 10–12; Bradley Aff., ECF No. 39-23, ¶ 8–11; Baldwin Aff., ECF No. 39-26, ¶¶ 7–9.) A pre-disciplinary hearing is an opportunity for a FCSO employee to present evidence and testimony before any discipline is imposed. (Bradley Dep., ECF No. 39-19, 28:1–13; Bradley Aff. ¶ 17; Flynn Aff ¶¶ 12–17.)

---

[2] Mr. Bradley testified "[w]hen a pre-disciplinary hearing could involve termination from employment it was the practice within the FCSO to refer to such hearings as 'pre-termination' hearings to ensure the deputy is placed on notice that a recommendation of termination from employment is a potential outcome of the hearing." (Bradley Aff. ¶ 14; Bradley Dep. 18:16–19:19.)

Joel Bradley, Assistant Director of Human Resources, held the hearing on April 23, 2018, approximately one year after the Kroger incident. (Bradley Dep. 13:15–19; Hearing Summary, ECF No. 39-11.) A Fraternal Order of Police ("FOP") attorney and Attorney Cooper attended on Dep. Marcus's behalf. (Hearing Summary.)

A major point of contention at the hearing was when Dep. Marcus learned of the Assault Charge. On that issue, Attorney Cooper testified that he did not tell Dep. Marcus about the jury demand he filed in the Assault Charge proceeding until later because "he was unable to get in contact with Deputy Marcus at the time." (*Id.* PageID 215.) Attorney Cooper explained that "[h]e knew that he would see Deputy Marcus in the near future and planned to update him then." (*Id.*) And the FOP attorney stated that the Municipal Court generated and mailed notice of the Assault Charge to Dep. Marcus's house on April 24, 2017. (*Id.*) Dep. Marcus testified that he was in West Virginia when the mailed notice arrived at his home, and he thought his wife told him about it on April 27. (*Id.*) Then, when he returned home, he notified his chain of command on his first day back to work, which was May 2 around 1 a.m.[3] (*Id.* PageID 215–16.) Dep. Marcus again denied knowing that Attorney Cooper filed a jury demand on his behalf on April 21. (*Id.*)

After the pre-disciplinary hearing, Mr. Bradley recommended Dep. Marcus's termination. (ECF No. 39-12.) Although Dep. Marcus had no other active discipline,

---

[3] Deputy James Wilson from the FOP testified that "the lodge advised [Dep. Marcus] that he did not need to submit an eDoc until his return to work." (*Id.* PageID 216.)

Mr. Bradley found that his conduct relating to the Kroger incident violated numerous regulations. (*Id.*) Mr. Bradley "focused on . . . the lying to internal affairs [b]ecause if that charge is substantiated, then it's a termination," and he found that Dep. Marcus had lied about when he learned of the Assault Charge. (Bradley Dep. 91:17–92:4; 93:18–22.) Chief Dep. Conley agreed with Bradley's recommendation (ECF No. 39-12), as did Sheriff Baldwin, who terminated Dep. Marcus effective May 12, 2018 (ECF No. 39-13).

### E.    Collective Bargaining Proceedings

Dep. Marcus filed a grievance to dispute his termination pursuant to the Collective Bargaining Agreement between FCSO and FOP. (ECF No. 39-14.) There was a hearing on the grievance, and the grievance was denied. (Flynn Aff. ¶¶ 23–24.) Sheriff Baldwin upheld the denial. (ECF No. 39-16.)

The FOP then filed an Intent to Arbitrate on Dep. Marcus's behalf. (ECF No. 39-17.) Prior to the arbitration, the parties executed a Grievance Settlement. (ECF No. 39-18.) The Grievance Settlement reinstated Dep. Marcus to his position as a patrol deputy and issued a 30-day unpaid suspension in lieu of termination. (*Id.*) Dep. Marcus received backpay of wages and benefits, less 30 days, and was restored the privilege of working special duty assignments. (*Id.*) He was required to attend an anger management class as a term of the Grievance Settlement. (*Id.*)

## II.    PROCEDURAL BACKGROUND

Dep. Marcus filed a discrimination charge with the Equal Employment Opportunity Commission (Compl., ECF No. 1, ¶ 3), and received his Right to Sue Letter (ECF No. 3). He timely filed this Complaint alleging race discrimination by

Defendant Sheriff Baldwin, in his official capacity[4], in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e, *et seq.* and Ohio Revised Code § 4112, *et seq.* (Compl. ¶¶ 31–44.) Following discovery, Defendant filed the instant Motion for Summary Judgment. (ECF No. 39.)

## III.   DEP. MARCUS'S MOTION FOR SURREPLY

The Court's Local Rules prohibit "additional memoranda beyond those enumerated . . . except upon leave of court for good cause shown." S.D. Ohio Civ. R. 7.2(a)(2); *De Angelis v. Nat'l Ent. Grp. LLC.*, No. 2:17-CV-924, 2019 WL 1024954, at *2 (S.D. Ohio Mar. 4, 2019) (Marbley, J.). While the Local Rules do not define good cause, "this Court has consistently held that in order for a party to be given permission to file a sur-reply, the reply brief must raise new grounds that were not presented as part of the movant's initial motion." *Id.* (citing *Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, No. 2:07–cv–1190, 2010 WL 4117552, at *4 (S.D. Ohio Oct. 19, 2010). Whether to permit a party to file a surreply is a matter left to the trial court's discretion. *Key v. Shelby Cnty.*, 551 F. App'x 262, 264 (6th Cir. 2014).

Dep. Marcus seeks to file a surreply arguing that Defendant "changed his presentation [in his reply] to add new evidence and introduced a new argument regarding inferences this Court should draw from Plaintiff's interaction with his attorney, Chris Cooper." (ECF No. 47, PageID 1800.) Dep. Marcus focuses on the word "it" that appears in Defendant's reply brief but not in the Taped Interview

---

[4] It is well-established that "[a] suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

transcript. (*Compare* Reply, PageID 1785 ("Lt. Christian's directly asked 'Were you aware of [the assault] on the 21st?' to which Plaintiff responded 'Yea I was aware of it.' Doc#39-9, PAGEID#201.") *with* Taped Interview ("M. Marcus: Yea I was aware of . . .")).

In response, Defendant concedes that "it" was a typo; but argues the error was not material because Defendant correctly quoted from the Taped Interview in his Motion for Summary Judgment and filed the Taped Interview in its entirety as an exhibit. (ECF No. 50, PageID 1812; *see* Mot. PageID 96; ECF No. 39-9.) "Plaintiff was on notice and had opportunity to respond to the argument in his [opposition brief]," Defendant explains, and "this Court has sufficient evidence to determine whether Joel Bradley had an honest belief that Plaintiff lied to IA." (ECF No. 50, PageID 1812–13.)

The Court agrees that Dep. Marcus's surreply repeats arguments made in his opposition brief about the Taped Interview. With the full Taped Interview transcript and a record of approximately 2,000 pages, the Court has ample briefing and evidence to rule on the Motion for Summary Judgment. Dep. Marcus's Motion for Surreply is **DENIED**.

## IV.   SHERIFF BALDWIN'S MOTION FOR SUMMARY JUDGMENT

### A.   Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving

party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

### B.    *McDonnell Douglas* Inquiry

Dep. Marcus brings his claims under both federal and state discrimination laws. Federal case law developed under Title VII is "generally applicable" to cases arising under the Ohio discrimination statute and so the Court will analyze both claims together. *White v. Kroeschell Facility Servs., Inc.,* No. 3:20-CV-130, 2021 WL

4399743, at *2 (S.D. Ohio Sept. 27, 2021) (Newman, J.) (citations omitted); *see* 42 U.S.C. § 2000e-2; Ohio Rev. Code §4112.02(A).

Dep. Marcus does not have direct evidence of discrimination, so he "must first establish a *prima facie* case of discrimination." *Pio v. Benteler Auto. Corp.*, No. 21-1231, 2022 WL 351772, at *3 (6th Cir. Feb. 7, 2022); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *as modified by Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). To establish his *prima facie* claim of race discrimination, Dep. Marcus must show by a preponderance of the evidence that he: 1) is a member of a protected class; 2) is qualified for the job; 3) suffered an adverse employment decision; and 4) was treated differently than similarly situated non-protected employees. *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001) (race); *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir. 2001) (preponderance). Then, if Dep. Marcus establishes a *prima facie* case, Defendant "must articulate some legitimate, nondiscriminatory reason for the termination. If [Defendant] meets this burden, then the burden of production shifts back to [Dep. Marcus] to demonstrate that the proffered reason is a pretext." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (internal citation and quotation marks omitted).

"Defendant's burden on the intermediate step is one of production; the 'ultimate burden of persuading the trier of fact . . . remains at all times with the plaintiff." *Lambright v. Kidney Servs. of Ohio*, 998 F. Supp. 2d 676, 683 (S.D. Ohio 2014) (Marbley, J.) (quoting *Burdine*, 450 U.S. at 253). On a motion for summary

judgment, the Court "considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).

### C. *Prima Facie* Case

Only element four is at issue. "To be similarly situated to the plaintiff, . . . the comparator employee must have been the same in all relevant aspects, except for belonging to the protected class. In close cases, that may be a jury question. But certainly not always." *Pelcha v. MW Bancorp, Inc.*, 455 F. Supp. 3d 481, 506 (S.D. Ohio 2020) (Cole, J.) (citations and quotations omitted), *aff'd*, 984 F.3d 1199 (6th Cir. 2021), *opinion amended and superseded*, 988 F.3d 318 (6th Cir. 2021); *see also Moore v. City of Clarksville*, No. 3:10-0141, 2011 WL 2938459, at *6–7 (M.D. Tenn. July 19, 2011) ("Exact comparators are often hard to come by, and whether any two employees are similarly situated often presents a question of fact for the jury."). If a reasonable jury could find that the named comparators were similarly situated then it is improper to find that a plaintiff has failed to establish a *prima facie* case. *Moore*, 2011 WL 2938459, at *6–7; *see e.g.*, *Jones v. Potter*, 488 F.3d 397, 405 (6th Cir. 2007) (citation omitted) (jury question where "reasonable minds could differ as to whether a preponderance of the evidence establishes that [plaintiff] was treated more harshly than similarly situated employees"); *Campbell v. Univ. of Akron*, 211 Fed Appx. 333, 345–46 (6th Cir. 2006) (district court improperly granted summary judgment where reasonable jury could conclude that others received less discipline for same or greater infractions).

Dep. Marcus points to four comparators to establish his *prima facie* case of

discrimination.

### 1.  *Sergeant Victor DiNardo*

Sergeant Victor DiNardo is a white male  that was involved in an off-duty altercation in a sports bar in December 2017. (Bradley Dep. Ex. 3, p. 4, 6, 31, 49.) When a fight broke out, Sgt. DiNardo's friend got involved to hold off the aggressor, and Sgt. DiNardo went over "to break up the fight." (*Id.* p. 6, 17.) The aggressor's girlfriend, Hollie Lopez, hit Sgt. DiNardo in the face with a cue ball, causing him to bleed from the nose and face. (*Id.* p. 7.) Sgt. DiNardo then grabbed Ms. Lopez in the throat area. (*Id.* p. 38.) When police arrived, Ms. Lopez tried to exit the bar, but Sgt. DiNardo would not let her leave, pulling her by the hair and shirt back into the bar. (*Id.* p. 7–9, 17, 38.) At some point, Sgt. DiNardo told the on-scene police officers that "he would get [Ms. Lopez] in [his] own way." (*Id.* p. 38.) Following this incident, Sgt. DiNardo was criminally charged and pled guilty to Disorderly Conduct. (*Id.* p. 31.)

After an IA investigation conducted by Lieutenant Lee VanDette, Sgt. DiNardo was suspended from duty for one day without pay for violating the following Rules of Conduct: 102.2 Obedience to Laws and Ordinances, 102.29 Unbecoming Conduct, and 102.43.1 Cause for Suspension or Dismissal/Unbecoming Conduct/Threats/Violations of Rules, Regulations, Policies, and Procedures. (*Id.* p. 6, 282.)

### 2.  *Deputy Christopher Andreini*

Deputy Christopher Andreini, a white male, was involved in an off-duty incident at an elementary school in March 2018. (ECF No. 42-5, PageID 1060, 1091.) According to the IA investigation report, a woman at a youth basketball

tournament said something to a four-year-old girl that offended tournament goers. (*Id.*) Dep. Andreini was upset by the comment and confronted the woman. (*Id.*) Joel Partlow intervened between Dep. Andreini and the woman, but the situation escalated. (*Id.*) Eventually Mr. Partlow told Dep. Andreini to leave, but Dep. Andreini refused. (*Id.* PageID 1061–62.) Dep. Andreini then grabbed Mr. Partlow by the throat and pushed him against a wall, slamming his head before putting his forearm against Mr. Partlow's throat. (*Id.* PageID 1062.) Mr. Partlow could not breathe and struggled to get away. (*Id.*) Someone called 911, the police arrived, and Dep. Andreini was kicked off of school property and not allowed back for the remainder of the weekend. (*Id.*)

Dep. Andreini was criminally charged, but the charges were dismissed when he completed community service, paid for Mr. Partlow's medical treatment, and apologized. (*Id.* PageID 1082, 1358.)

An IA investigation found sufficient evidence to proceed with disciplinary charges against Dep. Andreini for violating Rules of Conduct: AR 102:29 Unbecoming Conduct and AR 102:43 Cause for Suspension or Dismissal. (*Id.* PageID 1083.) Yet Sergeant Randall Jeane recommended Dep. Andreini receive only a documented oral reprimand because he "[did]not believe this incident [rose] to the level of a pre-disciplinary hearing" because Dep. Andreini was "an exceptional employee" who "demonstrates a level headed approach when dealing with stressful situations." (*Id.* PageID 1358.) Dep. Andreini's Major approved the discipline. (*Id.* PageID 1357.)

16

### 3.    *Deputy Natalie Randall*

Deputy Natalie Randall is a 14-year veteran of the FCSO and a white female. (Dep. Marcus Aff. ¶ 4; ECF No. 42-2, PageID 854.) An IA investigation revealed that she gave other deputies rides while on duty; failed to wear her duty belt, gun, and radio; and left work early on more than one occasion without permission. (ECF No. 42-2, PageID 858–62.) During the investigation, when asked if she left work early without permission, she answered "no, not that I can think of"—but her key card swipes indicated that she had left work early without permission. (*Id.* PageID 862.) At the conclusion of the IA investigation, Lt. Christian recommended Dep. Randall be charged with 15 Rules of Conduct violations, including a Lying Rule violation for lying about leaving work early. (*Id.*) Notably, Lt. Christian specifically concluded that Dep. Randall had made a statement to IA investigators that was "not factual." (ECF No. 42-2, PageID 862, 892.)

Mr. Bradley sent Dep. Randall a formal notice about her upcoming a pre-disciplinary conference, which advised that Sheriff Baldwin was considering discipline for violations of Rules of Conduct; importantly, the recommended Lying Rule violation was removed and instead there was a potential violation for not "speak[ing] the truth" during the investigation—a different Rule violation that does not require termination.[5] (ECF No. 42-2, PageID 853, 855.)

---

[5]AR102:1.5 simply states "[p]ersonnel shall . . . [s]peak the truth at all times," and does not require termination (the "Untruthfulness Rule"). (ECF No. 39-10.) Defendant does not explain why FCSO would charge an employee with a violation of the Untruthfulness Rule as opposed to the Lying Rule, despite the latter requiring termination.

The pre-disciplinary conference was held and Mr. Bradley recommended Dep. Randall be suspended for one day without pay for violating AR102:29 Unbecoming Conduct, AR102:9 Neglect/Inattention to Duty, and AR102:43.1 Unbecoming Conduct. (*Id.* PageID 848, 853–56.) Mr. Bradley explained that "a lie could not be substantiated due to the combination of [Dep. Randall's] statement that there would be no discrepancies 'that she could think of,' her statements to Lt. Christian where she appeared to implicitly believe she had permission to give other employees rides to their car during work hours, and that her superior officers did not challenge her actions." (ECF No. 45-1, PageID 1790.)

### 4. Deputy Eric Rakich

Deputy Eric Rakich, a white male, was investigated for receiving rides from Dep. Randall and lying to cover for Dep. Randall. (Marcus Aff. ¶ 5; ECF No. 42-2 PageID 857–58.) After an IA investigation, Lt. Christian recommended Dep. Rakich be charged with six Rules of Conduct violations for, *inter alia*, receiving the rides and not "speak[ing] the truth" during the investigation. (*Id.*) Specifically, Lt. Christian recommended that Dep. Rakich be charged with three violations of the Untruthfulness Rule because he lied during his IA investigation about when the rides began, the number of times he observed Dep. Randall not wearing her duty belt, and the length of time he and Dep. Randall sat in her car talking during drop offs. (ECF No. 42-2, PageID 857–58; ECF No. 39-10, AR102:1.5.)

Dep. Rakich's case was resolved by his chain of command rather than through a disciplinary hearing; he received a written reprimand from Major George Capehart for violating AR102:6 Telephone and Address Change Notification,

AR102:29 Unbecoming Conduct, and AR102:43.1 Unbecoming Conduct. (ECF No. 42-3.) He was not charged with a violation of the Untruthfulness Rule, despite Lt. Christian's recommendation. (*Id.*) Even so, the written reprimand states: "When asked, you initially stated that you were unaware that she was not wearing her duty belt. Later you admitted that you had noticed that she was not wearing the belt a couple of times." (*Id.*) It also notes: "You were asked to explain why it took so long for Deputy Randall to drop you at your car. You stated that the two of you would talk for 10–20 minutes. Video footage shows you and Deputy Randall talking for 33 minutes." (*Id.*)

5. *Analysis*

Defendant argues Dep. Marcus's comparators are inapt for several reasons. Turning first to Sgt. DiNardo and Dep. Andreini, Defendant urges the Court to focus solely on Dep. Marcus's violation of the Lying Rule, arguing that Mr. Bradley's recommendation to terminate Dep. Marcus was "not due to the conduct that Plaintiff engaged in at Kroger, but for lying to IA." (Mot. PageID 103.) Thus, according to Defendant, Sgt. DiNardo and Dep. Andreini are not appropriate comparators because they did not lie during their respective IA investigations. (*Id.*)

Defendant's proposed isolation of a violation of the Lying Rule is legally flawed. According to Dep. Marcus's termination letter, he was fired for a violation of the Lying Rule *as well as* violations of AR102.12.2 Communication through Channels-Reports, AR102:28.1 Court Actions, AR102:29 Unbecoming Conduct, and AR102:43.1 Unbecoming Conduct. (ECF No. 39-13.) The Court must consider the totality of the circumstances, which include the Kroger incident and the Assault

Charge—and compare those to the circumstances surrounding the discipline of Dep. Marcus's comparators.

Defendant then seeks to distinguish Sgt. DiNardo and Dep. Andreini on the grounds that Sgt. DiNardo is a supervisor with distinct job duties who works in a different department than Dep. Marcus (Mot. PageID 104), while Dep. Andreini works in a different division, (*id.* PageID 105). Both Sgt. DiNardo and Dep. Andreini have different chains of command except for Sheriff Baldwin. (*Id.* PageID 105–06.) In response to these arguments, Dep. Marcus argues that any differences in job duties are immaterial—Dep. Marcus and his comparators are all bound by the same Rules of Conduct. (Opp. PageID 831.) Next, Dep. Marcus contends Defendant is in control of the FCSO's discipline procedures, and those procedures are similar across divisions and chains of command. (*Id.* PageID 834–36.) He also argues there are issues of fact for the jury to decide: How does Dep. Marcus's conduct compare to that of Sgt. DiNardo and Dep. Andreini? (*Id.* PageID 833.)

The Court agrees with Dep. Marcus that a reasonable jury could find that Sgt. DiNardo and Dep. Andreini are similarly situated comparators. All three men are bound by the same Rules of Conduct. Their disciplinary procedures—IA investigations, followed by recommendations and discipline—were similar, with Defendant as the ultimate decision maker. Defendant fails to explain how different intermediate chains of command alters these facts. *See Martin v. Toledo Cardiology Consultants, Inc.,* 548 F.3d 405, 412 (6th Cir. 2008) (explaining for a comparator to be similarly situated "an exact correlation is not required by the law of this circuit").

20

A reasonable juror could also conclude that the seriousness of the conduct of these three is comparable. Grabbing someone by the throat area, yanking her hair and shirt, and stating he would get her "in [his] own way" (Sgt. DiNardo), is conduct at least as severe as giving someone an open-handed shove to the face. Likewise, grabbing someone by the throat and pushing them against the wall (Dep. Andreini), is at least as severe as the open-handed shove. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (holding that "to be found similarly situated, plaintiff and his proposed comparator must have engaged in acts of comparable seriousness") (quotations and citations omitted). In fact, Sgt. DiNardo continued to physically engage with Ms. Lopez after the police had arrived and made a threatening statement. Mr. Partlow required medical treatment and children in the vicinity observed Dep. Andreini's conduct. In contrast, Dep. Marcus's confrontation with Mr. Truss lasted 45 seconds, and Mr. Truss was not injured. Nevertheless, Dep. Marcus was terminated, while Sgt. DiNardo was suspended for one day and Dep. Andreini received an oral reprimand.

Defendant also attempts to distinguish Deps. Randall and Rakich as inapt comparators. He argues Dep. Randall's lie was not substantiated by her investigation because she hedged when she was asked about leaving early without permission—an equivocation as opposed to an outright lie. (Reply PageID 1782.) As to Dep. Rakich, Defendant avers Dep. Rakich's situation is distinguishable from Dep. Marcus's because (1) it was resolved by his own chain of command rather than through a disciplinary hearing; (2) Lt. Christian recommended a violation of the

Untruthfulness Rule rather than the Lying Rule; and (3) "[h]e was merely inaccurate when responding to Lt. Christian's questioning as to when" he began receiving rides from Dep. Randall (by a month). (*Id.* PageID 1783.)

Deps. Randall and Rakich are both appropriate comparators. Deps. Marcus, Randall, and Rakich are all FCSO deputies subject to the same Rules of Conduct. Each was subject to an IA investigation conducted by Lt. Christian, and at the conclusion of their respective investigations, Lt. Christian found each had lied.

Defendant attempts, unconvincingly, to distinguish "lying" from "being untruthful" or being "merely inaccurate"—these distinctions are best put to a jury. As an old proverb goes, "a half-truth is a whole lie." Whether a FCSO employee is charged with a Lying Rule violation and facing potential termination, or an Untruthfulness Rule violation and mere reprimand, appears to be dictated by the whim of the FCSO. Given the lack of consistent application of these Rules of Conduct, the Court is duty-bound to conclude there is a fact issue for the jury to decide.

Dep. Marcus has established his *prima facie* case.

## D.  Pretext

Defendant's burden is to produce evidence that Dep. Marcus's termination was for a legitimate, nondiscriminatory reason, *Burdine*, 450 U.S. 255–56, and Defendant meets that burden by offering testimony from Lt. Christian and Mr. Bradley that they believed Dep. Marcus violated the Lying Rule and termination was the appropriate consequence. (Christian Aff. ¶ 15; Bradley Dep. 91:17–92:4; 93:18–22.)

Once a defendant has proffered a legitimate nondiscriminatory reason(s) for a plaintiff's termination, the burden shifts back to the plaintiff to demonstrate that there is a genuine issue of material fact as to whether the reason(s) is mere pretext for discrimination. *Blizzard*, 698 F.3d at 283. He may do so by showing Defendant's reason (1) had no basis in fact; (2) did not actually motivate its action; or (3) was insufficient to motivate its action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)).

Defendant makes three pretext arguments: (1) that Dep. Marcus has produced no evidence rebutting Defendant's honest belief that Dep. Marcus lied during the IA investigation (Mot. PageID 109–11); (2) that Dep. Marcus cannot overcome testimony that he was terminated because of his Lying Rule violation (*id.*); and (3) FCSO has not tolerated substantiated lies during IAs by other employees not in a protected class. (*Id.*)

Here, Dep. Marcus has offered sufficient evidence to create genuine issues of material fact as to whether Defendant's reason for his termination is mere pretext. Sixth Circuit "cases that have found disparate treatment of comparators enough to establish pretext usually involve circumstances where a [defendant] tolerates a certain type of misconduct, leaving it unpunished, but singles out and punishes the plaintiff for the same type of misconduct." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 894 (6th Cir. 2020). A reasonable jury could find such circumstances exist here.

In particular, Dep. Rakich's case raises significant questions for a jury with regard to pretext—although he lied during his IA investigation, Lt. Christian recommended only Untruthfulness Rule violations, which do not require termination. (ECF No. 42-2, PageID 857–58.) Then Dep. Rakich's chain of command resolved his discipline and did not even find a violation of the Untruthfulness Rule, even though Dep. Rakich's reprimand contained notes detailing Dep. Rakich's lie during the investigation. (ECF No. 42-3.)

Likewise, Dep. Randall's case raises material questions for a jury. Although she equivocated during her IA investigation, Mr. Bradley did not take Lt. Christian's recommendation to charge her with a Lying Rule violation. (ECF No. 42-2, PageID 848, 853–56.) And even prior to Dep. Randall's pre-disciplinary conference, Mr. Bradley had reduced the potential charge against her from a Lying Rule violation to Untruthfulness Rule violation—another fact in the record Defendant fails to explain. (*Id.* PageID 853, 855.)

Dep. Marcus has met his pretext burden.

### E.    Dep. Marcus's Anger Management Claim

In his federal and state race discrimination claims, Dep. Marcus alleges that he suffered an adverse employment action "when he was terminated and then later reinstated with a 30-day paid suspension and ordered to attend anger management training." (Compl. ¶¶ 34, 41.) While Defendant makes arguments in his summary judgment motion related Dep. Marcus's anger management training (Mot., PageID 106), Dep. Marcus "fails to delineate that claim in [his] brief in opposition to summary judgment" and so that claim is abandoned. *E.E.O.C. v. Home Depot*

24

*U.S.A., Inc.*, No. 4:07CV0143, 2009 WL 395835, at *17 (N.D. Ohio Feb. 17, 2009) (slip op.); *see also Conner v. Hardee's Food Sys.*, 65 Fed. Appx. 19, 2003 WL 932432, at *4 (6th Cir. 2003) (unpublished) (finding that, "[b]ecause Plaintiffs failed to brief the issue before the district court . . . Plaintiffs abandoned their . . . claim."); *Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812, 839 (E.D. Mich. 2008) ("It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment.").

## V.     CONCLUSION

For the reasons set forth above, Dep. Marcus's Motion for Surreply (ECF No. 47) is **DENIED**, and Defendant's Motion for Summary Judgment (ECF No. 39) is **DENIED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**